**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **CITY OF ATLANTA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action File No.:** |
| | ) | **1:13-cv-02249-ODE** |
| | ) | |
| **ALLIANZ GLOBAL RISKS** | ) | |
| **US INSURANCE COMPANY,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff the City of Atlanta, Georgia, by and through its attorneys, files this Complaint against Defendant Allianz Global Risks US Insurance Company and alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. The City of Atlanta, Georgia ("City") is a municipal corporation with its principal place of business located at 55 Trinity Avenue, S.W., Atlanta, Georgia, 30303-0300.

2. Allianz Global Risks US Insurance Company ("Allianz") is a California corporation with its principal place of business located at 225 West

Washington Street, Suite 1800, Chicago, IL. Allianz is, among other things, in the business of issuing commercial property insurance to municipalities, like the City. Allianz is licensed to transact business in the State of Georgia.

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

4. Allianz is subject to the personal jurisdiction of this Court.

5. Venue is proper in this Court.

## FACTS

### *The R.M. Clayton Facility*

6. At all times relevant to the Complaint, the City has operated a wastewater treatment facility known as the R.M. Clayton Wastewater Treatment Facility, which is located at 2440 Bolton Road, Atlanta, Georgia ("R.M. Clayton").

7. R.M. Clayton treats approximately 180 million gallons of raw sewage each day for the City and can handle as much as 240 million gallons per day on a short-term basis.

8. R.M. Clayton covers approximately 77 acres of property.

9. R.M. Clayton consists of, among other things, various detached buildings and structures, in-ground and above-ground tanks, conduits, reservoirs, pumps, electrical equipment, and machinery.

### *The Insurance Policy*

10. The City and Allianz entered into a contract for insurance bearing policy number CLP3010219 (the "Policy"). A copy of the Policy is attached as Exhibit A to this Complaint.

11. The Policy has effective dates of March 1, 2009, to March 1, 2010.

12. The Policy affords the City, among other things, insurance coverage for all risks of direct physical loss or damage to Insured Property at Insured Locations, as those terms are defined in the Policy.

13. The Policy provides:

> A. INSURING AGREEMENT
>
> 1. Subject to the terms, conditions, exclusions and limitations contained herein or endorsed hereon and in consideration of the premium paid, this "policy" covers all risks of direct physical loss or damage to Insured Property at Insured Location(s), provided such physical loss or damage occurs during the Policy Period.

14. The Policy contains a general limit of liability in the amount of $300,000,000.

15. The Policy contains a sublimit of liability in the amount of $100,000,000 for damage caused by flood (hereinafter, the "Flood Sublimit").

16. The Policy contains another sublimit of liability in the amount of $10,000,000 for damage caused by flooding that occurs to property located in areas designated as High Hazard Zones For Flood (hereinafter, the "HHZ Sublimit").

17. The Policy provides that "[i]f more than one Program Sublimit(s) is involved in an 'occurrence,' the Program Sublimit(s) specified for the peril involved is the maximum Program Sublimit(s) applicable to such 'occurrence.'"

18. The Policy defines the term "Insured Property" to mean "[r]eal property in which the Insured has an insurable interest."

19. The Policy defines the term "location" to mean "a building, yard, dock, wharf, pier or bulkhead or any group of the foregoing bounded by public streets, clear land space, open waterways or any combination thereof, with each public street, clear land space or open waterway measuring no less than fifty (50) feet wide. Any bridge or tunnel crossing such streets, space or waterways renders such separation inoperative. The term 'locations' means more than one 'location.'"

20. The Policy defines the term "High Hazard Zones For Flood" to mean, in pertinent part, "all property at a 'location' that is partially or totally situated in an area which at the time of the loss or damage has been designated on a Flood Insurance Rate Map (FIRM) to be a Special Flood Hazard Area (SFHA)."

21. The Policy does not define the word "property."

22. The Policy does not define the word "area."

23. The Policy also affords coverage for "time element loss" that directly results from covered physical loss or damage.

24. The Policy provides:

> A. LOSS INSURED
>
> 1. This "policy" covers TIME ELEMENT loss, as provided under TIME ELEMENT COVERAGES, during the PERIOD OF LIABILITY directly resulting from physical loss or damage not otherwise excluded by this "policy" to Insured Property at Insured Location(s), or as otherwise provided in this section or endorsed hereon.

25. The Policy covers Time Element loss at any "location."

26. The Policy affords Time Element coverage for Extra Expense loss. Specifically, the Policy provides:

> B. TIME ELEMENT COVERAGES
>
> * * *
>
> 2. EXTRA EXPENSE
>
> (a) The recoverable EXTRA EXPENSE loss is the reasonable and necessary extra costs incurred by the Insured during the PERIOD OF LIABILITY as respects the following:
>
> (1) extra costs to temporarily continue as nearly normal as practicable the conduct of the Insured's business; and

(2) extra costs of temporarily using property or facilities of the Insured or of others; less any value remaining at the end of the PERIOD OF LIABILITY for any property obtained in connection with the above.

27. The Policy defines the Period of Liability to mean:

E. PERIOD OF LIABILITY

1. The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except LEASEHOLD INTEREST and as shown below, or if otherwise provided under the TIME ELEMENT COVERAGE EXTENSIONS, Is as follows:

a. For building and equipment, the period of time:

(1) starting on the date of physical loss or damage not otherwise excluded by this "policy"; and

(2) ending when with due diligence and dispatch the building and equipment could be:

(a) repaired or replaced; and

(b) made ready for operations;

under the same or equivalent physical and operating conditions that existed immediately prior to such physical loss or damage.

Such period of time is not limited by the Policy Expiration Date.

28. The Policy contains a $25,000,000 sublimit of liability for Extra Expense.

***The Allianz 2007 Site Audit And Property Risk Analysis Report***

29. On or about May 8, 2007, Allianz conducted an audit of R.M. Clayton for the purpose of, among other things, identifying areas of exposure and assisting in the selection of appropriate coverage.

30. Based on its audit of R.M. Clayton, Allianz determined that R.M. Clayton was not at a high risk for flood damage.

31. Based on its audit of R.M. Clayton, Allianz determined that the risk of flood at R.M. Clayton was "light."

32. Based on its audit of R.M. Clayton, Allianz determined that R.M. Clayton was located entirely in "Flood Zone X."

33. "Flood Zone X" is a designation utilized by the Federal Emergency Management Agency ("FEMA").

34. "Flood Zone X" corresponds to areas that are not subject to high risk for flooding.

35. Property in "Flood Zone X" is subject to a low risk of flood damage.

36. "Flood Zone X" is not among the flood zones designated by FEMA to be "Special Flood Hazard Areas."

37. After the May 8, 2007, audit, Allianz prepared a "Property Risk Analysis Report" for R.M. Clayton (hereinafter the "Allianz Risk Report").

38. The Allianz Risk Report identifies the entirety of R.M. Clayton as being in "Flood Zone X."

39. The Allianz Risk Report identifies no portion of R.M. Clayton as being in "Flood Zone AE."

40. "Flood Zone AE" is a designation utilized by FEMA.

41. "Flood Zone AE" is among the flood zones designated by FEMA to be "Special Flood Hazard Areas."

42. A copy of the Allianz Risk Report based on the May 8, 2007, audit was provided to officials in the City's Division of Risk Management.

43. The City's Division of Risk Management manages the City's insurance program, including by negotiating and purchasing appropriate insurance policies.

44. Allianz intended for the City to review the contents of the Allianz Risk Report.

45. Allianz knew or reasonably should have known that the City would rely on the contents of the Allianz Risk Report in connection with, among other things, the procurement and/or renewal of its insurance for R.M. Clayton.

46. Allianz intended for the City to rely on the contents of the Allianz Risk Report.

47. It was the City's regular practice to act on each recommendation it received in reports such as the Allianz Risk Report.

48. In evaluating its options for insurance prior to purchasing the Policy, the City reviewed the Allianz Risk Report and acted on each of the recommendations made therein.

49. Because the Allianz Risk Report identified R.M. Clayton as being located entirely within "Flood Zone X," the City did not procure excess flood insurance coverage for R.M. Clayton above the $10,000,000 HHZ Sublimit when it purchased the Policy.

50. If the Allianz Risk Report had identified R.M. Clayton as being subject to the $10,000,000 HHZ Sublimit, the City would have procured excess flood insurance for R.M. Clayton.

51. Because the Allianz Risk Report identified the risk of flood at R.M. Clayton as "light," the City did not procure excess flood insurance coverage for R.M. Clayton above the $10,000,000 HHZ Sublimit when it purchased the Policy.

52. Allianz did not advise the City in May 2007 or at any time thereafter that the risk of flood for R.M. Clayton, as stated in the Allianz Risk Report, was inconsistent with the risk of flood designation on the Flood Insurance Rate Map in effect at that time.

53. Instead, and despite telling the City that the risk of flood was "light" and that R.M. Clayton was in "Flood Zone X," Allianz marketed and sold the Policy to the City containing reference to a Flood Insurance Rate Map that placed a portion of R.M. Clayton in "Flood Zone AE."

54. At all relevant times, the risk of flood in "Flood Zone AE" was not "light."

55. Upon information and belief, property in "Flood Zone AE" is not subject to a low risk of flood damage.

56. "Flood Zone AE" is designated on the Flood Insurance Rate Map covering R.M. Clayton to be a Special Flood Hazard Area.

57. The City relied on Allianz's statements in the Allianz Risk Report in connection with its procurement of insurance for R.M. Clayton, including the City's purchase of the Policy.

58. At the time the Allianz Risk Report was prepared and provided to the City, and at all times relevant to this lawsuit, the Flood Insurance Rate Map in effect for R.M. Clayton erroneously showed a body of water – Whetstone Creek – running through a portion of R.M. Clayton.

59. At the time the Allianz Risk Report was prepared and provided to the City, however, Whetstone Creek had been diverted through a concrete culvert beneath R.M. Clayton.

60. At the time the Allianz Risk Report was prepared and provided to the City, Whetstone Creek did not pose a significant flood risk to R.M. Clayton.

61. Based on its audit of R.M. Clayton, Allianz was aware when it entered into the Policy that Whetstone Creek did not pose a significant risk of flood to R.M. Clayton.

62. Based on its audit of R.M. Clayton, Allianz was aware when it entered into the Policy that the Flood Insurance Rate Map in effect for R.M. Clayton erroneously depicted Whetstone Creek running through a portion of R.M. Clayton.

***The September 2009 Flood And The City's Flood Loss***

63. Beginning on or about September 21, 2009, R.M. Clayton was affected by flooding ("the September 2009 Flood").

64. The September 2009 Flood resulted in direct physical damage loss or damage to Insured Property located at R.M. Clayton and forced the City to expend substantial amounts to maintain normal operations following the flood.

65. On or about September 22, 2009, the City, through its representatives at Willis of Georgia, Inc. ("Willis"), gave written notice to Allianz of the loss at R.M. Clayton.

***Allianz' Preliminary Loss Adjustment***

66. On or about October 1, 2009, Allianz, through its adjuster, Chris McCoy, commenced adjustment of the damage to property at R.M. Clayton.

67. Mr. McCoy inspected R.M. Clayton on multiple occasions.

68. During his inspections of R.M. Clayton, Mr. McCoy observed the widespread damage caused by the flood.

69. Also during his inspections, Mr. McCoy observed that the City was taking steps to restore temporary and permanent plant operations.

70. As part of the adjustment, Mr. McCoy met with individuals from the City to discuss the physical damage that occurred throughout the City, including damage at R.M. Clayton.

71. On or about October 8, 2009, Allianz informed the City that Allianz' claim investigation was continuing and that all rights of both Allianz and the City were being fully preserved. Allianz further informed the City that Allianz was "still investigating the flood zones for the R.M. Clayton Water Reclamation Center."

72. On or about October 9, 2009, Allianz, through Mr. McCoy, advised the City that "a large portion of the facility is within the high hazard flood zone and therefore would be subject to the $10,000,000 Flood Sublimit."

73. Following October 9, 2009, Mr. McCoy continued to investigate which flood zones applied to R.M. Clayton.

74. In particular, on and after October 9, 2009, Mr. McCoy continued to investigate, among other things, damage to several lift/pump stations and a large trunk line.

75. Mr. McCoy advised the City that Allianz was evaluating these additional areas of damage "for flood zones, damages [and] cause of damage," and that Allianz would, sometime later, "review the coverage" for that damaged property.

76. Given the ongoing investigation of flood zones, damages, and the causes of damage to R.M. Clayton, the City did not have a final coverage determination from Allianz as to the coverage that was going to be provided.

77. Mr. McCoy's continued investigation of the flood zones applicable to R.M. Clayton reasonably led the City to believe that Allianz would continue to investigate the City's claim and that Allianz would agree, at a minimum, that the

Policy requires Allianz to indemnify the City for those portions of its losses at R.M. Clayton to which the $10,000,000 Flood Sublimit does not apply.

78. Further, because Mr. McCoy continued to investigate the loss, the City reasonably believed that the $100,000,000 Flood Sublimit would apply to loss or damage to property at R.M. Clayton that was not subject to the HHZ Sublimit.

79. Moreover, given the ongoing investigation by Allianz and the continuing nature of the City's extra expense damages, the damages sustained by the City were not susceptible to final calculation and payment in October 2009.

80. The continued investigation and adjustment of the City's loss by Allianz evidenced that the investigation and adjustment was ongoing and that Allianz was not relying on or enforcing the Policy's suit limitations provision.

81. On November 12, 2009, Allianz issued an advance payment to the City in the amount of $10,500,000 for damage to R.M. Clayton and certain other property that had sustained damage as a result of the September 2009 Flood.

82. In or around the fall of 2011, Allianz made a further payment to the City in the amount of $500,000 for additional damage sustained in the September 2009 Flood.

83. Allianz provided no further report or information to the City concerning its ongoing investigation of flood damage at R.M. Clayton or its

ongoing investigation of the applicable flood zones until May 2012. Upon information and belief, however, Allianz continued its investigation of the R.M. Clayton flood damage and kept its file open concerning the City's claim.

84. In May 2012, and as part of its continuing investigation and adjustment of the City's September 2009 Flood loss, Allianz advised the City that an additional payment would be made to the City for flood-related damage to City property.

85. Allianz advised the City that further payment would be made after the City executed an Agreement for the Removal of Stock for Better Protection and/or Disposition (hereinafter, the "Salvage Agreement").

86. On May 18, 2012, the City informed Allianz that it was seeking further reimbursement for loss sustained as a result of the September 2009 Flood.

87. The City returned the executed Salvage Agreement to Allianz.

88. To date, Allianz has not paid the amounts due under the Salvage Agreement.

***The City's Property Damage Claim***

89. The R.M. Clayton flood loss is not limited to the amount of the Policy's $10,000,000 HHZ Sublimit.

90. The Policy provides in pertinent part:

E. PROPERTY DAMAGE COVERAGE EXTENSIONS

The following Coverage Extensions are subject to the applicable Program Sublimit(s), do not increase the Program Limits Of Liability, and are subject to all provisions of this "policy".

* * *

2. Flood

a. This "policy" covers direct physical loss or damage to Insured Property at Insured Location(s) caused by or resulting from "flood".

* * *

(2) The term "High Hazard Zones For Flood" means:

(a) all property at a "location" that is partially or totally situated in an area which at the time of loss or damage has been designated on a Flood Insurance Rate Map (FIRM) to be a Special Flood Hazard Area (SFHA);

(b) all property in areas where the National Flood Insurance Program (NFIP) is not in effect, and where all property at a "location" is partially or totally situated in an area which is within a one hundred (100) year flood plain or its worldwide equivalent; or

(c) all property at a "location" that is partially or totally protected by dams, dikes, levees or walls which were intended to protect such property from the level of a one

hundred (100) year flood or its worldwide equivalent, regardless of any Zone or Area designation or assignment by Federal Insurance and Mitigation Administration (FIMA) or other recognized authority having jurisdiction.

91. The plain language of the High Hazard Zones For Flood definition applies, if at all, only with regard to property that was actually located, partially or totally, within a Special Flood Hazard Area or a one-hundred year flood plain or property that is protected by a dam, dike, levee, or wall intended to protect against a one-hundred year flood.

92. The definition of High Hazard Zones For Flood does not state that the "location" must be "partially or totally situated in an area which . . . has been designated . . . to be a Special Flood Hazard Area."

93. The definition of High Hazard Zones For Flood does not state or reference the Insured Location.

94. Under the Policy, coverage for damage to buildings and other property that is not partially or totally (a) located in a Special Flood Hazard Area, (b) located in a one-hundred year flood plain, or (c) protected by a dam, dike, levee, or wall intended to protect against a one-hundred year flood, is not limited by the HHZ Sublimit.

95. The plain language of the High Hazard Zones For Flood provision also must reasonably be read to mean that the High Hazard Zones For Flood definition only applies, if at all, where all property at the "location" is partially or totally (a) located in a Special Flood Hazard Area, (b) located in a one-hundred year flood plain, or (c) protected by a dam, dike, levee, or wall intended to protect against a one-hundred year flood.

96. It follows that, where property at the "location" is not partially or totally (a) in a Special Flood Hazard Area, (b) in a one-hundred year flood plain, or (c) protected by a dam, dike, levee, or wall intended to protect against a one-hundred year flood, the High Hazard Zones For Flood definition does not apply.

97. A substantial portion of R.M. Clayton affected by the September 2009 Flood is not partially or totally (a) located in a Special Flood Hazard Area, (b) located in a one-hundred year flood plain, or (c) protected by a dam, dike, levee, or wall intended to protect against a one-hundred year flood.

98. A substantial amount of damage at R.M. Clayton caused by the September 2009 Flood occurred to buildings and other property that is not partially or totally (a) located in a Special Flood Hazard Area, (b) located in a one-hundred year flood plain, or (c) protected by a dam, dike, levee, or wall intended to protect against a one-hundred year flood.

99. A substantial amount of damage at R.M. Clayton caused by the September 2009 Flood occurred to buildings and other property that were located completely outside any area meeting the definition of High Hazard Zones For Flood.

100. Where the HHZ Sublimit does not apply, the Policy affords the City coverage for direct physical loss or damage to property at R.M. Clayton resulting from the September 2009 Flood up to the $100,000,000 sublimit for flood.

101. Contrary to the plain language or any reasonable interpretation of the Policy, Allianz has construed the Policy to limit the City's coverage for loss sustained at R.M. Clayton to only $10,000,000.

102. On or about May 18, 2012, the City presented Allianz with a claim for the full amount of the R.M. Clayton flood loss that falls within the $100,000,000 Flood Sublimit.

103. Contrary to its obligations under the Policy, Allianz has refused to pay the balance of the City's claim for property damage caused by the September 2009 Flood.

***The City's Extra Expense Claim***

104. In addition to the City's claim for physical damage to property located at R.M. Clayton, which has been partially adjusted and paid, the City was

forced to expend substantial amounts as a direct result of physical loss or damage to covered property so it could maintain, as nearly as possible, normal operations at R.M. Clayton following the flood event.

105. The City has incurred extra expense loss continuously since the September 2009 Flood occurrence.

106. Following the flood, the City incurred extra expense losses at a rate in excess of $500,000.00 per month.

107. The City's extra expense loss rate has now diminished to a level where it is possible for the City to reasonably present an extra expense claim for reimbursement under the Policy.

108. On or about May 18, 2012, the City advised Allianz that it was making a claim for extra expense loss under the Policy (the "Extra Expense Claim").

109. As of May 18, 2012, the City had sustained extra expense loss of approximately $35,561,287.48.

110. The City continued to sustain extra expense losses on and after May 18, 2012.

111. The City continued to sustain extra expense losses through June 2012.

112. Contrary to its obligations under the Policy, Allianz has refused to afford coverage to the City for its Extra Expense Claim.

113. The City has fully paid all premiums due under the Policy.

114. The City has complied with all conditions for coverage under the Policy.

115. Notwithstanding the City's payment of all premiums due under the Policy and the City's compliance with all conditions to coverage under the Policy, Allianz refuses to acknowledge its obligations to the City.

116. Allianz has taken positions contrary to its obligations under the Policy and applicable law with regard to the City's claim for coverage for loss sustained at R.M. Clayton.

## COUNT I

**(Breach of Contract – Property Damage)**

117. The City incorporates by reference the allegations set forth in paragraphs 1 through 116 above as if fully set forth herein.

118. By refusing to pay the City for the full amount of the City's damage to property up to the Policy's $100,000,000 Flood Sublimit, Allianz has breached its contract with the City and proximately caused the City to sustain damages. The City is entitled to recover such damages from Allianz.

## COUNT II

**(Breach of Contract – Extra Expense)**

119. The City incorporates by reference the allegations set forth in paragraphs 1 through 116 above as if fully set forth herein.

120. By refusing to pay the City for the full amount of the City's extra expense loss, up to the Policy's $25,000,000 extra expense sublimit, Allianz has breached its contract with the City and proximately caused or will cause the City to sustain damages. The City is entitled to recover such damages from Allianz.

## COUNT III

**(Fraud)**

121. The City incorporates by reference the allegations set forth in paragraphs 1 through 116 above as if fully set forth herein.

122. The Allianz Risk Report states that the entirety of R.M. Clayton is located in "Flood Zone X" and that the risk of flood at R.M. Clayton is "light."

123. At all relevant times, Allianz acted knowingly or recklessly regarding the falsity of its statement that the entirety of R.M. Clayton was located in "Flood Zone X" and that the risk of flood at R.M. Clayton was "light."

124. Allianz intended for the City to rely on the statements in the Allianz Risk Report and intended to induce the City to enter into the Policy.

125. The statements contained in the Allianz Risk Report caused the City to reasonably believe that the $10,000,000 HHZ Sublimit did not apply to R.M. Clayton.

126. At all relevant times, and despite its representation that R.M. Clayton was located entirely in "Flood Zone X," Allianz intended to rely on the Flood Insurance Rate Map in effect when the Policy was issued for purposes of applying the $10,000,000 HHZ Sublimit for any flood loss affecting R.M. Clayton.

127. The City in fact relied, to its detriment, on Allianz's statements and omissions when it purchased the Policy.

128. Allianz's statements and omissions induced the City to: (a) purchase the Policy with the belief that the $10,000,000 HHZ Sublimit did not apply to R.M. Clayton; (b) pay all premiums due on the policy; and (c) not to purchase additional or supplemental flood coverage for R. M. Clayton.

129. By now asserting that a portion of R.M. Clayton is located in a flood zone other than "Flood Zone X," Allianz's statements and omissions to the contrary constitute fraud proximately causing the City to sustain damages. The City is entitled to recover such damages from Allianz.

## COUNT IV

**(Negligent Misrepresentation in the alternative to Fraud)**

130. The City incorporates by reference the allegations set forth in paragraphs 1 through 116 above as if fully set forth herein.

131. The Allianz Risk Report provided to the City negligently states that the entirety of R.M. Clayton was "in Flood Zone X," while the Flood Insurance Rate Map in effect at all times relevant to this lawsuit shows a substantial portion of R.M. Clayton in "Flood Zone AE."

132. Based on the statements contained in the Allianz Risk Report, the City reasonably believed the entirety of R.M. Clayton was located in "Flood Zone X" and that, as such, Allianz would not apply the $10,000,000 HHZ Sublimit to any flood loss occurring at R.M. Clayton.

133. The City reasonably relied on Allianz's statements and omission when it purchased the Policy.

134. Allianz's statements caused the City to: (a) purchase the Policy with the belief that the $10,000,000 HHZ Sublimit did not apply to R.M. Clayton; (b) pay all premiums due on the policy; and (c) not to purchase additional or supplemental flood coverage for R. M. Clayton.

135. By stating that R.M. Clayton was "in Flood Zone X" and leading the City to believe that the $10,000,000 HHZ Sublimit would not apply to R.M. Clayton, Allianz breached its duty of care to not supply the City with false information.

136. Because Allianz now takes the position that R.M. Clayton is subject to the $10,000,000 HHZ Sublimit and has refused to pay the City's claims related to R.M. Clayton beyond that amount, Allianz's statements constitute the tort of negligent misrepresentation proximately causing the City to sustain damages. The City is entitled to recover such damages from Allianz.

## COUNT V

### (Reformation)

137. The City incorporates by reference the allegations set forth in paragraphs 1 through 116 above as if fully set forth herein.

138. Upon entering into the Policy, Allianz did not intend all flood damage at R.M. Clayton to be subject to the Policy's $10,000,000 HHZ Sublimit.

139. Upon entering into the Policy, the City reasonably believed that any flood damage at R.M. Clayton would not be subject to the Policy's $10,000,000 HHZ Sublimit.

140. As a result of (a) the mutual mistake of the parties or (b) the mistake of the City, on the one hand, and the fraud or inequitable conduct of Allianz on the other hand, the Policy fails to reflect the agreement of the parties concerning the amount of coverage available under the Policy for flood damage occurring at R.M. Clayton.

141. Accordingly, the Policy should be reformed to provide coverage for any and all flood damage at R.M. Clayton up to the Policy's $100,000,000 Flood Sublimit.

WHEREFORE, the City demands a jury trial on all issues so triable and respectfully prays for judgment in its favor and against Allianz as follows:

a. That the Policy be reformed to provide coverage for any and all flood damage at R.M. Clayton up to the Policy's $100,000,000 Flood Sublimit;

b. That Allianz is estopped from taking the position that R.M. Clayton is subject to the $10,000,000 HHZ Sublimit;

c. For compensatory damages in an amount to be proved at trial;

d. For punitive damages;

e. For prejudgment interest;

f. For court costs and attorney's fees; and

g. For such other relief as this court deems just and proper.

[Signature page follows]

Respectfully submitted, this 20th day of September 2013.

s/ Cathy Hampton
Cathy Hampton
Georgia Bar No. 321899
CDHampton@atlantaga.gov

City Attorney
City of Atlanta, Department of Law
68 Mitchell St., S.W., Suite 4100
Atlanta, GA 30303-3520

s/ Lawrence J. Bracken II
Lawrence J. Bracken II
Georgia Bar No. 073750
lbracken@hunton.com
Andrew Stulce
Georgia Bar No. 882889
astulce@hunton.com

HUNTON & WILLIAMS LLP
Bank of America Plaza
Suite 4100
600 Peachtree St., N.E.
Atlanta, GA 30308-2216
Telephone: (404) 888-4182
Facsimile: (404) 602-9074

*Of Counsel*

Walter J. Andrews*
Virginia Bar No. 46031
Michael S. Levine*
Virginia Bar No. 48013

HUNTON & WILLIAMS LLP
1751 Pinnacle Drive
Suite 1700
McLean, Virginia 22102
(703) 714-7400

***Attorneys for Plaintiff,***
***City of Atlanta***

* *Pro hac vice* applications
to be filed.